STATE WATER CONTROL
BOARD, Plaintiff,

v.

Martin R. HOFFMAN, Secretary of the
Army, et al., Defendants.

Civ. A. No. 75–0137.

United States District Court,
W. D. Virginia,
Roanoke Division.

Jan. 11, 1977.

Andrew P. Miller, Atty. Gen., James E. Ryan, Jr., Deputy Atty. Gen., David E. Evans and Frederick S. Fisher, Asst. Attys. Gen., Richmond, Va., for plaintiff.

Samuel G. Wilson, Asst. U. S. Atty., Roanoke, Va., for defendants.

## MEMORANDUM OPINION AND ORDER

TURK, Chief Judge.

The Virginia Water Control Board ("the Board") challenges in this action for declaratory and injunctive relief the jurisdiction asserted by the defendants, under §§ 9 and

10 of the Rivers and Harbors Act of 1899 ("the 1899 Act"), 33 U.S.C. §§ 401, 403, over Smith Mountain Lake as "navigable waters of the United States." Jurisdiction over this case is founded upon 28 U.S.C. § 1331, and the Board has stated a cause of action under the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

Smith Mountain Lake is a man-made body of water, and was created in 1964 by impoundment of the Roanoke River for purposes of electric power generation pursuant to a license granted by the Federal Power Commission. This license became necessary when the Commission determined that damming the River would obstruct a navigable water of the United States.[1] In 1965, the Army Corps of Engineers listed Smith Mountain Lake as a navigable water of the United States. Ten years later, the Corps instituted a program requiring that permits be obtained for any construction affecting the Lake. The permit requirements, initiated in April, 1975, were imposed under the purported authority of §§ 9 and 10 of the 1899 Act, 33 U.S.C. §§ 401, 403, and constitute the particular exercise of federal authority challenged by the Board. Although the Board has sought broad relief declaring Smith Mountain Lake a navigable water of Virginia, subject to Virginia's exclusive control, the scope of the controversy actually presented is limited to the power of the Corps to establish its permit requirements under the 1899 Act. The protean nature of possible federal authority over Smith Mountain Lake under such statutes as the Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1254 *et seq.*, as well as the unchallenged jurisdiction of the Federal Power Commission under 16 U.S.C. § 797(c), are not implicated in this case. The adjudication of the Corps' authority to impose a permit program thus does not require reaching the Board's contention that Virginia possesses exclusive jurisdiction over

the Lake for all purposes, nor would it affect the total field of federal involvement in the Lake.

§§ 9 and 10 of the 1899 Act generally prohibit construction in or obstruction of navigable waters of the United States and provide as follows:

§ 9—It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War [Secretary of Army]: Provided, That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War [Army] before construction is commenced: And provided further, that when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of War [Army], it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War. [Army].

§ 10—The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, break-

---

1. Defendants contend that the Board has acquiesced in this determination that the Roanoke River is navigable, and further asserts that because navigability for purposes of the 1899 Act is equivalent to navigability under 16 U.S.C. § 796(8), the Board should be estopped from challenging the Corps regulations. The court, however, merely views the FPC determination as supportive to its own conclusion, and declines to resolve this case on an estoppel basis.

water, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War [Secretary of the Army]; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War [Army] prior to beginning the same.

Accordingly, the jurisdiction of the Corps over the Lake under the 1899 Act, and the validity of its permit program depend upon the navigability of Smith Mountain Lake.

In defining navigability for purposes of the 1899 Act, courts have drawn upon judicial constructions of that term of art. *Hardy Salt Company v. So. Pac. Trans. Co.,* 501 F.2d 1156, 1167–1169 (10th Cir. 1974). In *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870), the Court first essayed a definition of navigability in the context of a statute requiring licensing for commercial transportation on the navigable waters of the United States:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact . . . when they form . . . a continued highway over which commerce is or may be carried on . . . 77 U.S. at 563.

This factual test was further elaborated in *U. S. v. Montello,* 87 U.S. (20 Wall.) 430, 441–442, 22 L.Ed. 391 (1874), where the Court stated that "capability of use" rather than the historical "extent and manner of that use" was the "true criterion of the navigability of a river." Further, in *Economy Light and Power Co. v. U. S.,* 256 U.S.

113, 123–124, 41 S.Ct. 409, 65 L.Ed. 847 (1940), the Court reasoned that artificial obstruction of a once navigable river would not militate against a finding of navigability under the 1899 Act. This flexible definition of navigability was adhered to and explicated in *U. S. v. Appalachian Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), a case involving the scope of the federal commerce power in relation to Federal Power Commission licensing for construction of a hydroelectric dam on the New River. In concluding that the New River was navigable, the Court stated:

> Use of a stream long abandoned by water commerce is difficult to prove by abundant evidence . . . Nor is lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for simpler types of navigation.

> The evidence of actual use of the Radford-Wiley's Falls section for commerce and for private convenience, when taken in connection with its physical condition, makes it quite plain that by reasonable improvement the reach would be navigable for the type of boats employed on the less obstructed sections. 311 U.S. at 417, 61 S.Ct. at 303.

The case law does not, of course, yield a hard and fast test of navigability. It does, however, reveal that courts have consistently adopted an expansive and flexible construction of navigability, with a view towards evidence of past or present use "for commerce and for private convenience", as well as evidence of the reasonable capability of a particular River for navigation. 311 U.S. at 416–417, 61 S.Ct. at 303. The history of actual use of the Roanoke River at Smith Mountain and the hydrological and survey evidence of present navigational capability establish that the Roanoke River, at least up to the geography now occupied by Smith Mountain Lake, is a navigable water of the United States and that the Lake itself is, by that fact, a navigable water of the United States as well.[2]

---

2. Thus, once it is determined that the portion of the River now inundated was navigable, that portion remains so in spite of its obstruction by the Dam. In short, its navigable status is not

It is undisputed that the stretch of the Roanoke River from Salem, Virginia to Weldon, North Carolina was historically used for commercial transportation. Acts of the Virginia legislature and historical accounts attest to the commercial exploitation of the River prior to the advent of the railroad. At the peak of this period of its commercial life, a time during which river transportation figured heavily in economic development, the maximum annual estimated value of commerce on the River between Weldon and Clarksville, Virginia was six million dollars, and one million dollars between Clarksville and the confluence of the Roanoke and Pigg Rivers. The Board has attempted to minimize the significance of this commerce by showing that the dreams of its developers were inflated, and that, in any event, commercial use of the River ceased at its confluence with the Pigg, three miles short of Smith Mountain. The plans and language of the pre-railroad developers may indeed appear overblown today. Nonetheless, rivers were significant vehicles of commercial transportation at that time and in that economy. Retrospection cannot detract from the navigability, as a matter of history, of the Roanoke River. And if the River supported at its height as a waterway one million dollars in traffic from the Pigg to Clarksville, then surely some of that commerce traversed what is now inundated by the Lake. Bearing in mind the perspective adopted in *Appalachian Power:*

> nor is it necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties and dangers of navigation influence the regularity and extent of the use. . . . Even absence of use over long periods of years because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in a constitutional

altered by the Dam, and the resulting Lake derives its navigability from the underlying navigability of the River.

sense. 311 U.S. at 409–410, 61 S.Ct. at 300.

the court finds little difficulty in concluding that the River was historically navigable up to Smith Mountain.[3]

Contemporary hydrological and survey evidence demonstrates that the River at Smith's Mountain was navigable by simpler craft prior to impoundment, and that the backwaters of the Lake are still navigable by such boats. Accordingly, historical as well as hydrological and survey evidence establishes that the River at Smith Mountain could sustain navigation. The Board's proofs may have tended to show that this section of the River was and is not navigable by larger vessels or in the absence of some portage. Yet the preponderance of the evidence, including hydrological estimates of flow and the testimony of expert witnesses who actually boated on the River, has proven its capabilities for supporting batteau travel. The evidence also failed to identify any obstruction not susceptible to reasonable abatement. Under the capability test of navigability posited in *Montbello, Economy Light and Power and Appalachian Power, supra,* the defendants have clearly shown that River was navigable prior to impoundment, and still is in the backwaters of the Lake—totally apart from the question of its historical navigability.

The Water Resources Development Act of 1976, § 154 of P.L. 94–587, 90 Stat. 2917, limiting the regulatory authority of the Corps over wharves and piers, impinges on the resolution of the validity of the permit program, however. Absent that recent statutory development, the determination that the River at Smith Mountain was navigable in fact would be dispositive of that question, inasmuch as the River's underlying navigability under *Economy Light and Power, supra,* determines the navigability of Smith Mountain Lake. If the Lake is deemed navigable, then the Corps may law-

3. The Court addresses here only the statutory issue, rather than the question of the scope of the commerce clause, or its congruence or lack thereof with § 10 jurisdiction under the 1899 Act.

fully require permits for construction effecting the Lake under the 1899 Act.

§ 154 provides:

The prohibitions and provisions for review and approval concerning wharves and piers in waters of the United States as set forth in section 10 of the Act of March 3, 1899 (30 Stat. 1151) and the first section of the Act of June 13, 1902 (32 Stat. 371) shall not apply to any body of water located entirely within one State which is, or could be, considered to be a navigable body of water of the United States solely on the basis of historical use in interstate commerce.

The legislative history of that provision discloses that it was intended as a "very limited exception to Section 10 [of the 1899 Act] . . . where there is no real federal interest to be served . . ." Cong.Rec. Sept. 29, 1976, page 11639. Its rationale was explained as follows during debate:

". . . the requirement that the body of water form a continuous waterway between states was transformed into the simple requirement that the waterway in conjunction with order forms of transportation form a continuous transportation link between states. Thus, a body of water completely landlocked within the borders of a single state might be found to possess an interstate character if a federal highway or railroad line ran adjacent to it. Under this far-fetched definition, it is difficult to conceive of many bodies of water which would not qualify for federal supervision."

Cong.Rec., id.

■ The court is of the opinion that § 154 does not limit the jurisdiction of the Corps in this case. First, the court's conclusion of navigability is not premised "solely" upon historical use. Rather, the navigability of the Lake is a matter of present capability as well as history. Second, it is doubtful that a lake created by impoundment of an interstate river pursuant to a federal license can be deemed to be "any body of water located entirely in one State." Finally, the federal interest in Smith Mountain Lake is substantial. The Lake was created as a Federal power project under the Federal Power Act, 16 U.S.C. § 791a *et seq.,* and the Corps has a continuing involvement in the maintenance of the project, as well as the control of the level of the pool created by the damming of the River. 16 U.S.C. § 811; *see also,* 16 U.S.C. §§ 804, 807. A review of § 154 and its legislative history convinces the court that it should not be construed to limit the jurisdiction of the Corps over construction of piers and wharves in Smith Mountain Lake.

For the foregoing reasons, the court is constrained to conclude that Smith Mountain Lake is a navigable water of the United States, under the 1899 Act, and that the construction permit program instituted by the Corps of Engineers in authorized thereunder. Accordingly, judgment of no cause for action is entered on behalf of and in favor of defendants, and plaintiff's complaint is hereby dismissed. SO ORDERED. This opinion shall constitute the court's findings of fact and conclusions of law.